Marlin CONSTANCE, Individually, and
Marcon Country Homes, Inc., and Jet
Services, Inc., d/b/a Riverchase Properties, a joint venture, Appellants,

v.

B.B.C. DEVELOPMENT COMPANY,
et al., Respondents.

No. WD 57142.

Missouri Court of Appeals,
Western District.

July 25, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 29, 2000.

John Tongier, Merriam, KS, for appellant.

Arlen Tanner, Kansas City, for respondent.

RONALD R. HOLLIGER, Judge.

Marlin Constance, individually, Marcon Country Homes, Inc. and Jet Services, Inc., d/b/a Riverchase Properties, appeal the order of the Circuit Court of Platte County, Missouri, granting a directed verdict in favor of defendant Edward Bayless after the conclusion of plaintiffs' evidence.

This suit arose from a real estate contract for the sale of a subdivision located in Parkville, Missouri. Plaintiffs as the buyers of the subdivision sued defendants B.B.C. Development Co., Inc., and Ralph Bax, L. Edward Bayless, and James Camp, individually, as officers and directors of B.B.C.. Marcon Country Homes is owned by Marlin Constance, and Jet Services, Inc. is owned by Josh Tobin. The trial proceeded upon plaintiffs' First Amended Petition, which alleged: (1) the defendants made fraudulent misrepresentations and fraudulently concealed material information regarding previous landslides and subsurface instability of property defendants sold to plaintiffs; (2) they negligently made material misrepresentations and concealed material information regarding previous landslides and subsurface instability on the property; and (3) they materially breached the contract of the parties by affirmatively representing the property as suitable for residential improvement. Prior to trial, plaintiffs dismissed all the original defendants except L. Edward Bayless, and dismissed Counts II and III, leaving only the alternative theories of fraudulent misrepresentation and fraudulent concealment that were pled together in Count I. After oral arguments and briefing by the parties, the trial court granted Bayless' motion for directed verdict at the close of plaintiffs' evidence.

**STANDARD OF REVIEW**

In reviewing a directed verdict granted in favor of a defendant, an appellate court views the evidence and permissible inferences in the light most favorable to the plaintiff, disregards contrary evidence and inferences, and determines whether the plaintiff made a submissible case. *Thong v. My River Home Harbour, Inc.*, 3 S.W.3d 373, 377 (Mo.App.1999). Directing a verdict is a drastic measure. *Id.* A presumption, therefore, exists in favor of reversing the trial court's judgment sustaining a motion for directed verdict unless the facts and inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result. *Id.* A case, nevertheless, should not be submitted to the jury unless each and every fact essential for liability is predicated on legal and substantial evidence; the question whether the

evidence is substantial is one of law for the court. *Meridian Enterprises Corp. v. KCBS, Inc.*, 910 S.W.2d 329, 331 (Mo.App. 1995).

■ The trial court gave no explanation for and made no findings as to its reasons for granting the directed verdict in favor of defendant. Therefore, our concern on review is whether the trial court reached the proper result and not the route by which it reached that result. *Runny Meade Estates, Inc. v. Datapage Tech. Int'l, Inc.* 926 S.W.2d 167 (Mo.App.1996).

## FACTS

Viewed in accordance with the above standard, the following evidence is considered in determining the submissibility of the plaintiffs' claim. The subdivision was known as Riverchase Properties and originally included twenty-seven lots. B.B.C. purchased the property in 1986 and general contractor Tomahawk Construction constructed the streets and sewers. Tomahawk was selected by Bayless. The construction manager for Tomahawk was Jim Kissick. To finance the purchase, Bayless secured a line of credit for B.B.C., backed by the personal guarantees of Bayless and Camp. Construction began in November of 1987, but because of engineering and construction problems, road and utility infrastructure was not completed until November of 1989.[1]

**Riverchase Properties Plat Map:**

RIVERCHASE

*Take I-635 to Hwy 9, West to Riverchase Entrance — Just East of Park College*

This is an artist's rendition — please refer to original plat for accurate lot sizes.

One of the primary streets in the subdivision is Wall Street. In the spring of 1990, a lateral crack developed in Wall Street, resulting in a landslide in the area of Lots 19 through 22. Following the landslide, substantial repair work was undertaken by Tomahawk. In April 1991, Bayless, Bax and Camp met with Tomahawk to discuss Tomahawk's invoice for the repairs to Wall Street. In preparation for that meeting, Camp prepared a memorandum detailing the events leading up to and following the 1990 landslide and Wall Street failure. That memorandum has become known as the "Camp Memo" and was distributed to all attending the meeting.

1. Some houses had been completed by the time of plaintiffs' purchase of the development.

Wall Street had been built into a slope on the side of a bluff. Camp testified at trial that such a street can be constructed on a hillside so long as it is "keyed in properly" to the slope and the fill dirt utilized is properly compacted. In his 1991 memorandum, Camp wrote that he believed Wall Street was not keyed into the slope and the fill was not properly compacted. He testified that he believed these failures led to the 1990 collapse. The Camp Memo also addressed poor drainage along Wall Street; that Camp had concerns about landslides; that there were soft spots along Wall Street that were not corrected with newly compacted fill dirt but, instead, with asphalt; and that the fill material used was full of organic materials such as tree stumps and roots. Camp testified at trial that such items decay and eventually leave voids that lead to settlement; that fill should be compacted in layers, but this was not done; and that compaction was so poor along Wall Street that he saw Jim Kissick sink up to his shin in fill material. He described repair attempts that failed to hold and that Wall Street slid a second time in the spring or early summer of 1990.

Following the first repair attempts, Bayless hired a soils engineer, Larry Houghton of KC Testing Lab, to design repairs to be made by Tomahawk. Repairs were again made by Tomahawk, pursuant to Houghton's design. The Camp Memo, however, indicated that compaction remained a problem, and predicted future problems. Bayless was provided with the Camp Memo and attended the meeting in April 1991, during which Camp's concerns were aired.

Bayless and Constance and Tobin had been acquainted for years. In the spring of 1992, Bayless contacted Constance and advised he was having trouble marketing

Riverchase Properties, said something to the effect that he was desperate to sell, and asked Constance for marketing suggestions. There was no discussion of sale of the property. Constance, at that time, toured the subdivision with Bayless and provided marketing ideas. During this visit, Bayless did not provide Constance with any information regarding landslides or street failures.

In July 1992, B.B.C. entered into a contract to sell Riverchase Properties to Pat O'Connor. On August 21, 1992, Bayless received a letter from O'Connor's attorney, requesting assurances with respect to the soil and substrata. Specifically, he wanted an engineer's opinion that "the property, including the soil and substrata, is *suitable for home building* ..." (emphasis added). Bayless responded by providing a May 22, 1992 letter from engineer Houghton. The letter discussed the causes of three slides (near Lot 18) observed by Houghton in May on slopes in a cul-de-sac several hundred feet west of the 1990 slide. He opined that the 1992 slides were caused by a water main break and the roadway was "generally stable."[2] Houghton testified that he received a telephone call from a lawyer identifying himself as representing a potential buyer and requesting Houghton provide a more detailed letter with the assurances about soil stability; Houghton refused because of his concerns about having no control over what might be done during future construction. He acknowledged that he also might have been concerned about giving such an opinion letter because of his knowledge and experience with the 1990 slide. Brady did not receive the assurances requested, and O'Connor did not complete the purchase of the property.[3]

Only a few weeks later, in September, Bayless contacted Constance and offered to sell him Riverchase Properties.[4] Bay-

---

2. Houghton testified that he never intended his letter to serve as the assurances requested by Brady.

3. There is nothing in the record that indicates whether there was some particular reason O'Connor was requesting these assurances.

4. Lots previously transferred and not available for purchase were Lots 7, 16, 18, 23, 25.

less told Constance he really needed to sell the property, that the bank was really on him to get rid of it, and that he had other financial difficulties. At trial, Bayless acknowledged that the project was grossly over budget, that he was grossly delinquent in completing the project, that he was personally obligated for the entire debt under his personal guarantee with the bank, and that the bank had commenced foreclosure proceedings on the property. Bayless and Constance met for a second time at the subdivision and again toured the property. On September 16, 1992, Constance signed a contract to purchase the property, consisting of 22 lots, with closing to occur on October 31, 1992. Included in the lots for purchase were lots 19 through 22. Constance went to the City of Parkville to confirm the streets had been dedicated, to see about the sewer, and to see if building permits would issue. He inspected the property by walking all the streets and many of the lots, and the curbs and gutters. He acknowledged at trial that he did not look at the City file regarding Riverchase or talk to the Director of Public Works; that if he had, he would have seen a letter saying that before the City would accept the streets, B.B.C. must fix the area where there had been a failure of the street.[5] Constance testified he had no reason to seek that information.

Prior to closing, Bayless arranged a drive-through tour of the property for Constance and Tobin, with Kissick. Constance and Tobin testified that Bayless accompanied them on the tour. Bayless testified he did not recall being on the drive-through but that he might have been. During the tour, no mention was made of the 1990 landslides or street failures involving Lots 19 through 22. Nor was there any mention of the failed sale to O'Connor a few weeks earlier. However, Kissick volunteered to Bayless and Constance that there had been a water line

break during the construction of the house on Lot 18, that the water had flowed for days, and that it caused a landslide on Lot 18. Tobin asked Kissick if all the lots were buildable, and Kissick answered in the affirmative. Bayless did not comment on either statement by Kissick. Neither Bayless nor Kissick disclosed any information about the 1990 landslides along Wall Street and adjoining Lots 19 through 22. Bayless did not provide plaintiffs with copies of the Camp Memo or the Houghton letter, and did not mention the O'Connor transaction. Bayless testified that he did not provide the information because he thought everything that had occurred on Wall Street had been repaired; he said he had no reason to believe there was any potential problem for anything else to occur, in spite of the concerns expressed in the Camp Memo.

Prior to closing, two additional lots were sold by B.B.C.. The sale was completed on October 31, 1992 for the remaining 20 lots, including Lots 19 through 22, where the 1990 problems had occurred.

Constance testified that within a week or so after closing, he met Bayless' partner, Bax, at the subdivision. Bax brought him a box of documents and told Constance they were from Camp. Constance reviewed those documents, which consisted of a marketing brochure and rolls of plans. The Camp Memo was not included in the documents he received.

The following spring of 1993, Wall Street cracked, tore away, and slid south on Lots 19 through 22. Camp testified at trial that the 1993 landslide damage was in the same general location of and was similar to that of the 1990 landslide damage. Constance and Tobin both testified that had they known of the 1990 landslides or the extent of the repairs undertaken, they would never have purchased the property.

---

5. Such a letter was not shown to either Constance or Tobin during the testimony, or introduced as an exhibit during the plaintiffs' case. Except as implied in the question, there was no evidence at trial that such a letter existed that might have put plaintiffs on notice of problems.

Prior to the 1993 landslide, plaintiffs sold three of the 20 lots purchased. Since the landslide, they have sold two lots. Included in the remaining unsold property are Lots 19 through 22. According to the testimony of Houghton, 1993 has been denominated a "500 year" flooding year by the Corps of Engineers.

## DISCUSSION

Plaintiffs alleged both affirmative misrepresentations and concealment of material information by defendant with regard to subsurface instability and whether the property was suitable for improvement. They claim the trial court erred because none of the points raised by Bayless in his motion support entry of a directed verdict; they contend furthermore that plaintiffs made a submissible case on the alternative theory of fraudulent concealment. They also contend that their theory of affirmative misrepresentation was sufficiently proven and that Bayless' grounds for a directed verdict did not defeat that theory as a matter of law.

■■ In Missouri, the elements of a submissible case of fraud are: (1) a false material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth, and the right to rely thereon; and (6) proximate injury. *Ringstreet Northcrest, Inc. v. Bisanz*, 890 S.W.2d 713, 720 (Mo.App.1995). Failure to establish any element is fatal to recovery. *Nigro v. Research College of Nursing*, 876 S.W.2d 681, 686 (Mo.App.1994). Plaintiffs contend they made a submissible case on each of these elements. Defendant contends they did not sufficiently prove the first element because there was no proof of an affirmative false statement, the third element because defendant did not deliberately suppress the truth with intent to deceive, and the fifth element because plaintiffs did not

exercise ordinary diligence in investigating the property prior to purchasing it.

■■ Plaintiffs first contend that the evidence showed that Bayless fraudulently concealed the 1990 landslide and the Camp Memo; that there was no evidence of an affirmative misrepresentation. A party to a contract is not under a legal obligation to disclose everything about the property's history; however, concealment of a fact which one has a duty to disclose may serve as a substitute element for an affirmative false representation. *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 61 (Mo.App.1999). A duty to disclose arises from a classical fiduciary relationship, from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose this knowledge. *Id.* at 60. A duty exists also where one party expressly or by clear implication places a special confidence in the other. *Blaine v. J.E. Jones Constr. Co.*, 841 S.W.2d 703, 705 (Mo.App.1992).

Our analysis requires us first to determine, for purposes of the fraudulent concealment theory, whether Bayless had a duty to disclose information to the plaintiffs about the 1990 street failures, landslides, and related issues concerning soil stability.

## I. FRAUDULENT CONCEALMENT

■ Plaintiffs assert that Bayless had a duty to disclose the information based on the factors discussed in *Blaine*. In that case, the plaintiffs sued for fraud, alleging that they were induced into purchasing their homes by defendant's fraudulent concealment of its intent to build an apartment complex in the subdivision near their homes. The central issue was whether the defendant-seller had a duty to disclose to buyers, its alleged plan to build apartments; the buyers claimed the plan would adversely effect the market value of their homes. The *Blaine* plaintiffs contended that the failure to disclose constituted fraudulent concealment. The court in

*Blaine* found that the seller had no such duty. In making its determination, the court considered several open-ended factors: the relative intelligence of the parties; the relation of the parties to each other; the nature of the fact not disclosed; the nature of the contract; whether the concealer is the buyer or seller; the importance or materiality of the fact not disclosed; and the respective knowledge of the parties. Bayless claims that under the *Blaine* analysis, there was no duty to disclose. We consider these factors in turn.

### Relative intelligence of the parties

Defendant argued to the trial court that plaintiffs were more experienced at real estate development. Plaintiffs claim that is not the real issue under this factor, which they assert is the innate intellect and education level of the parties. Defendant admits that all the parties are college educated but argues that plaintiffs' knowledge and experience exceed defendant's. Bayless claims that plaintiffs were experienced real estate developers who knew B.B.C. would have a construction and development file, and if they had come to B.B.C.'s office to look at it or had asked for it, they would have discovered the problems. Plaintiffs respond that the Bax delivery led them to believe they had received all important information. Bayless also contends that plaintiffs would have known to check the County Recorder for lien information, which would have shown a lien for the work done by Tomahawk for the repairs of the 1990 road failure. Defendant also notes that Tobin testified it was in the back of his mind that the road area was steep and might be subject to earth movement. We find no indication that any party's intelligence was superior to another; all the parties were college educated. Plaintiffs had some greater experience in real estate development than defendant did, but only to a degree. Bay-

less was not naïve or inexperienced in such matters.

### Relation of the parties to each other

Plaintiffs argue that the parties had done business for years and were friends, and that this created a special relationship imposing upon defendant a duty to disclose. Defendant argues that there was no fiduciary relationship requiring a heightened duty, and no special confidence. He says it was an arms-length transaction despite the parties having known each other for years. There was no evidence the plaintiffs told defendant they expected him to fully disclose anything material, including past historical events, even though repaired and believed stable. Plaintiffs, in their reply brief, agree that no special relationship existed that would give rise to a duty. We find that, while the existence of a fiduciary or confidential relationship would make it more likely that a duty to disclose would be found, there was no evidence the relationship the parties shared was a fiduciary or confidential relationship and, thus, the transaction was a normal arm's length sale of land.

### Nature of the fact not disclosed

Plaintiffs argue that if a seller conceals an intrinsic defect not discoverable by reasonable care, there is a greater likelihood a duty will be found. In *Blaine*, the undisclosed fact (the developer's intent to build an apartment complex in residential property) was extrinsic because it was not a defect. In *Seidel v. Gordon A. Gundaker Real Estate Co., Inc.*, 904 S.W.2d 357 (Mo. App.1995), the undisclosed fact (an undedicated sewer system) was intrinsic because of an encroachment on certain sewer easements. Further, in *Seidel,* the court noted that there was no evidence a visual inspection of the property would indicate the encroachment on the sewer easements or the city's refusal to accept dedication because none of the documents mentioned the problem.[6] Plaintiffs here argue that

---

6. There was no indication in *Seidel* as to whether a check of governmental records would have revealed the undedicated sewer system. There was no decision, therefore, of the significance of the failure to check the records.

the defect was intrinsic; the streets were pristine; plaintiffs made visual inspections and contacted the City; and, though they did not specifically ask about landslides, they argue they did not have to. In *Seidel,* the court held that substantial evidence was adduced which would support a finding that the undisclosed information was not within the plaintiffs' reasonable reach ... and the reasonable inferences to be drawn were not so strongly against the plaintiffs as to leave no room for reasonable minds to differ. *Seidel,* 904 S.W.2d at 362.

■ Defendant argues that there is no evidence defendant believed the repaired road and slope were anything but stable; he reasonably believed the problem had been corrected. He argues that the construction manager, Kissick, opined that the lots were buildable even though he knew of the past problems. The nondisclosed event, he argues, was not even a defect at the time of sale, let alone a latent defect. A defect is not latent if discoverable by reasonable diligence. *Mobley v. Copeland,* 828 S.W.2d 717, 726 (Mo.App.1992). He reasons that plaintiffs should just have checked the files or inquired into the soil stability history, especially given that they already had information about the water main break and that Tobin "had in the back of [his] mind" that the area was steep and might be subject to earth movement.

■ In sales contracts, if the vendor conceals an intrinsic defect not discoverable by reasonable care, there is a greater likelihood that a duty to disclose will be found. *Blaine,* 841 S.W.2d at 708. Defendant did not mention the 1990 landslides during any of the walk-through or drive-through inspections with the plaintiffs. As with the defect in *Seidel,* there was no evidence a visual inspection of the property would indicate the soil stability problems.

There was substantial evidence which would support a finding that the undisclosed information was an intrinsic defect, i.e., not discoverable by reasonable care and, therefore, not within the plaintiffs' reasonable reach.

**Nature of the contract**

■ Plaintiffs argue that *Blaine* held that an arms-length sales contract would not give rise to a duty unless it involved a release or contract of insurance and, therefore, the issue is neutral and favors neither party. Defendant argues that this was an arms-length sale contract; that there is no evidence plaintiffs ever expressed or implied a special trust of defendant; and that a party who silently "trusts" that another would disclose all historical events does not impose a duty on the other to disclose. In their reply brief, plaintiffs agree with the analysis of defendant that this factor would not dictate disclosure. We find that this factor does not weigh in favor of establishing a duty because the contract is an arms-length sales contract for property; it is not a release or contract of insurance, which requires that all material facts must be disclosed.

**Whether buyer or seller is the concealer**

Plaintiffs argue that since a seller is more likely to have a duty to disclose than a buyer, and because plaintiffs are the buyer, then this factor weighs in favor of disclosure since Bayless was president, director and shareholder of the seller corporation and was the one who had contact with the plaintiffs. Defendant argues that B.B.C. was the seller, but B.B.C. was dismissed and plaintiffs proceeded solely against Bayless. He argues that although he had a personal interest, he was not the seller, and, therefore, had no duty to disclose the past event, which had been corrected and stable for over two years prior to the sale.

■ The concealer in this case is the seller. The seller was B.B.C. by its agent, Bayless. We agree that a seller is more likely to have a duty to disclose than a buyer.

## Materiality or importance of the fact not disclosed

Plaintiffs argue that this is a material misrepresentation, one which "would be likely to affect the conduct of a reasonable man." *Travelers Indemnity Co. v. Harris,* 216 F.Supp. 420 (E.D.Mo.1961). They say it is laughable for defendant to argue the prior landslides and street failures were not important or material, as it relates to the essence of developing the property. They point out that Bayless testified he wanted the plaintiffs to have all the information concerning the subdivision, but he failed to disclose the prior landslides because he thought they had been "solved." Nevertheless, plaintiffs argue, he knew the soil engineer had refused to provide a letter of assurances of soil stability to another buyer just three weeks prior to the contract with the plaintiffs.

Defendant argues that the landslide two years prior was not material because it had been repaired and had been accepted by the City; there was no evidence he considered it an important issue and he did not have engineering or construction experience. Conversely, he argues, the plaintiffs were experienced and did not ask, which supports the argument that past history, properly repaired, was not of importance to the transaction. It only became important after the heavy rains of 1993, a 500–year flood year. Citing *Thoroughbred Ford, Inc. v. Ford Motor Co.,* 908 S.W.2d 719 (Mo.App.1995) and *Blanke v. Hendrickson,* 944 S.W.2d 943 (Mo.App. 1997), defendant argues that it is at the time of sale, not later, that the importance of an historical event must be analyzed.

▉ Reasonable minds could differ as to whether defendant truly believed the problems were solved if even his own soils engineer would not provide a letter of assurances. It is not whether it was material to Bayless but whether it would be likely to affect the conduct of a reasonable man. A problem with a property's soil stability could have a significant effect on a reasonable buyer's decision to buy the property and, thus, is an important fact.

## Respective knowledge of the parties and their means of acquiring knowledge

Plaintiffs argue that this factor is interrelated with the intrinsic/extrinsic defect issue. Defendant admitted knowing of the prior slides, the concerns in the Camp Memo, and the engineer's refusal to provide assurances. Plaintiffs had no knowledge of the previous landslides or anything to alert them to a problem on visual inspection. Defendant had superior knowledge and the development records including the Camp Memo. Plaintiffs argue that documentation about the soil instability and/or landslides was not a matter of public record.[7] The Camp Memo was not provided to plaintiffs. Plaintiffs' inquiry of the City, they argue, was reasonable under the totality of the circumstances. Plaintiffs note that since defendant did not address this factor, it is assumed they concede.

Defendant did not address this issue in his brief. In his Motion for Directed Verdict, however, he argued that the parties' respective knowledge was relatively equal in that the City had indicated to the plaintiffs and defendant that it was ready to issue building permits and the roads and sewers had been accepted as fit for public use. Bayless argues that the means of acquiring information regarding the construction history of the site was as simple as plaintiffs asking questions or requesting files. Josh Tobin admitted that had he looked at the B.B.C., Tomahawk or City[8] development files, he presumably would have seen information regarding the 1990 landslides.

▉ We have been presented with no evidence that the soil problems and or landslides were a part of the public rec-

---

7. See Footnote 5.

8. Again assuming such information was in the City file; see Footnote 5.

ord.[9] Public disclosure of such information may put a reasonable purchaser on notice to inquire about the problems, however, absent evidence that such information was available to plaintiffs, it cannot be said that the means of acquiring the undisclosed information was balanced or fair. Moreover, in *Osterberger v. Hites Constr. Co.*, 599 S.W.2d 221, 228–229 (Mo.App. 1980), the court recognized that "fraud may be predicated on a concealed fact even though that fact could have been ascertained by an examination of the public records." A public record of an undisclosed fact does not necessarily negate a party's duty to disclose.

 The *Blaine* factors are overlapping and the relative weight of each is determined on a case-by-case basis. Our analysis of the *Blaine* factors does not present a clear duty to disclose on the part of defendant.

## II. PARTIAL DISCLOSURE

Plaintiffs rely alternatively on *Osterberger* to support their claim that Bayless had a duty to disclose based on partial disclosure by Kissick during the sales tour. They reason that defendant's disclosure of the smaller landslide on Lot 18 due to a broken water line made it reasonable for plaintiffs to assume that it was the only landslide and that if there were other landslides, particularly more substantial slides, they too would have been disclosed. Defendant argues that the plaintiffs failed to raise this issue to the trial court in opposing the defendant's motion for directed verdict or in their motion for new trial, and it is, therefore, not reviewable. Defendant's point is without merit in that the trial court's order directing a verdict did not set out its reasons for the directed verdict and, therefore, plaintiffs addressed each of the arguments made by defendant in its Motion for Directed Verdict. One of the arguments is that defendant had no duty to disclose information to the plaintiffs, which is the issue addressed by the theory of partial disclosure.

In *Osterberger*, the plaintiffs purchased a house from the defendant, who had knowledge of an existing deed of trust encumbering the property. Though the sale documents provided spaces for the disclosure of such information, the defendant did not do so. The court there recognized that concealment of a fact that one has a duty to disclose serves as a substitute element for a false and fraudulent misrepresentation, and held that defendants had a duty to disclose the existence of the deed of trust. *Osterberger*, 599 S.W.2d at 227.

The court in *Osterberger* further recognized that there are exceptions to the rule of nonliability for failure to disclose material facts, stating that "[p]artial information may be as misleading and deceptive as active misrepresentation, and we have imposed a duty to disclose material facts where the defendant has invited plaintiffs' confidence by making only a partial disclosure." *Id.* at 227.

 Whether a partial disclosure occurred is determined by the facts of each individual case. Under the circumstances here, we determine that the defendant partially disclosed information. Defendant's construction manager, Jim Kissick, on behalf of defendant, advised the plaintiffs that a water line broke during the construction of Lot 18 that the water flowed for several days, and that it caused a landslide on Lot 18. The partial disclosure of information, about landslides on Lot 18, implied that there had been no others or at least not serious ones. It created a duty to disclose information regarding landslides on Lots 19 through 22.

## III. BUYERS DILIGENCE

 Defendant again contends that because the transaction here was an arms-length transaction, there was no duty to disclose to the plaintiffs the existence of

**9.** See Footnote 5.

the 1990 landslides. He claims he did not owe the plaintiffs a duty of disclosure because the plaintiffs could have discovered the information by review of defendant's records or additional City files, placing the information within the fair and reasonable reach of the plaintiffs in the exercise of ordinary diligence. Defendant argues that even if he did owe plaintiffs a duty of disclosure, plaintiffs did not ask to review files of B.B.C. or the City and, therefore, the information was discoverable by the plaintiffs by the exercise of ordinary diligence. Defendant cites *Reis*, 997 S.W.2d at 62, which states "[m]ere silence does not constitute fraud when it relates to facts open to common observation, or is discoverable by the exercise of ordinary diligence, or where the information is as accessible to one party as to the other." The modern trend, however, is not to extend but to restrict the rule requiring diligence in persons to whom representations are made, and to condemn the falsehood of the person making the representation, rather than the credulity of the victim. *Id*. Here, the duty to disclose arises from partial disclosure. Partial disclosure does not constitute mere silence. *Id*.

 *Reis* involved a disclosure required by a written lease; the disclosure made was held to be a partial disclosure. Defendant argues that *Reis* is distinguishable because here there was no written requirement for any disclosure. We see no basis for making a distinction between an oral half-truth and a written one. The court in *Reis* held, that, "[w]hen a party makes a partial disclosure, the party then has a duty to tell the whole truth." *Id*. Plaintiffs sought information from defendant about whether the development was suitable for building, and investigated the property by seeking information from the City of Parkville as to whether the streets were dedicated, whether the sewers were completed, and whether building permits would issue.

 Plaintiffs argue that reasonable diligence is a question of fact for the jury;

that it is not a question of whether plaintiffs engaged in the exact type of investigation defendant argues they should have, but whether the efforts they did exercise were reasonable under the circumstances. Plaintiffs argue they had a right to rely on defendant's representations under *Colgan v. Washington Realty Co.*, 879 S.W.2d 686 (Mo.App.1994), holding that the right to rely is ordinarily a question of fact for the jury. Plaintiffs argue that the defendant, in hindsight, claims it would be relatively easy for plaintiffs to have discovered the soil instability; if they had only asked the defendant, he would have revealed the information. However, plaintiffs argue, defendant had the Camp Memo and did not provide it to plaintiffs; and he had the report from his soil engineer and did not pass it along. In *Iota Management Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 414 (Mo.App.1987), plaintiffs point out, the court held that the mere presence of opportunities for investigation will not itself preclude the right of reliance and the law does not require one with inferior knowledge to exercise extraordinary diligence. The court went further in holding that "the representee is entitled to rely on the representation when he lacks equal footing for learning the truth and where the facts are peculiarly within the knowledge of the party making the representation and are difficult for the representee to ascertain." *Iota*, 731 S.W.2d at 413. The general rule relating to the diligence required of one with inferior knowledge or standing who undertakes an investigation is that "the law does not require extraordinary diligence, and does not ask that a representee be unduly incredulous and skeptical, resort to extremes of precaution, or exhaust all possible sources and means of investigation." *Id*.

 In *Fairmont Foods Co. v. Skelly Oil Co.*, 616 S.W.2d 548, 550 (Mo.App. 1981), the court held that "the duty to speak may arise from inequality of position, a fiduciary relationship between the parties, or a demonstration of superior

knowledge on the part of one of the parties which is not within the fair and reasonable reach of the other." "These are alternative bases for the imposition of the duty to speak and proof of a fiduciary relationship or inequality of position does not have to be conjoined with superior knowledge of a defendant to establish liability..." *Id.* In *Fairmont,* as in the instant case, the plaintiff's case rested upon a theory of superior knowledge. There, the court determined that the plaintiff demonstrated a lack of diligence in failing to inquire of public records whether there were easements on the property prior to its purchase of the property. "Even by this standard [superior knowledge], the evidence does not disclose diligence by Fairmont or any circumstance that would have frustrated ordinary inquiry." *Id.* at 551. "Assuming that the showing made in the evidence that the circuit court records, which disclosed the limitation of access, constituted a public record, that alone does not defeat Fairmont's action although it is a factor which the trial court might consider on the issue of the availability of the information to Fairmont." *Id.* Conversely, plaintiffs in the case at bar did inquire of the City of Parkville whether the streets were dedicated, the sewers accepted, and building permits would issue. Defendant is correct in citing *Fairmont* for the proposition that a plaintiff must exercise prudence and reasonable care to ascertain the condition of the subject property. However, we determine that a jury could believe that plaintiffs did exercise reasonable care by its physical investigation of the property and its trip to the City of Parkville. Moreover, the trier of fact could believe that a partial disclosure discouraged additional diligence by the buyers. As stated by *Fairmont,* the "use of 'some measure of precaution to safeguard [their] interest' will demonstrate the diligence required under the circumstances." *Id.* at 552.

We find that defendant partially disclosed information, that a landslide had occurred in Lot 18. After partially disclosing this information, defendant had a duty to tell the whole truth, to disclose that landslides had also occurred on Lots 19 through 22.

## IV. OTHER POINTS

Aside from arguing that defendant had no duty to disclose information to the plaintiffs, defendant further argues that plaintiffs failed to establish other necessary elements of fraud, that such failure precludes recovery, and that fraud is not presumed nor is an inference of fraud sufficient to support a claim of fraudulent misrepresentation. In support of this contention, Bayless argues there was no evidence Bayless himself made a representation, nor that was it material. He argues that it was Kissick who made the statement that all the lots were buildable; that Kissick was not the agent of Bayless so as to require any correction of the statement by Bayless; and further that Kissick's statement was an opinion which does not constitute a false representation. Defendant argues that Kissick was an independent contractor and relies on *Tom Lange Co., Inc. v. Cleaning by House Beautiful,* 793 S.W.2d 869 (Mo.App.1990), which held that a principal is generally not responsible for the wrongs committed by an independent contractor. Moreover, defendant contends, the statement by Kissick, even if not mere opinion, was not material because the only evidence at trial was that Bayless also believed the lots were buildable and that Bayless was free to rely on this statement of Kissick as an opinion of his general contractor.

### A. Agency

We address first whether Kissick's statement can be imputed to Bayless. The testimony was that during the drive-through tour with Kissick and Bayless, plaintiffs inquired as to whether the lots were "buildable." Kissick replied in the affirmative and Bayless remained silent. Therefore, plaintiffs argue, this is an adoption of the representation of Kissick, Bay-

less' agent. Plaintiffs argue that Bayless selected Tomahawk (Kissick) to serve as general contractor for the project and Bayless personally arranged the tour and whether Kissick at that time was an agent of Bayless was a question of fact for the jury, who could logically find that for the purposes of the tour arranged by Bayless, Kissick was acting as his agent. Finally, plaintiffs argue that whether Bayless' silence amounted to fraud is a question for the jury; and even if the court would sustain the issue, it would only apply to the claim of fraudulent misrepresentation and not that of fraudulent concealment.

 "The existence of an agency relationship is ordinarily a question of fact for the trier of fact." *Tom Lange Co.,* 793 S.W.2d at 871. "Where there are no conflicts in the evidence, however, the determination of what constitutes agency and whether there is evidence tending to prove the existence of agency is a question of law." *Id.* "Agency is a fiduciary relationship which results from the consent by one person, the principal, to another, the agent, for the agent to act on the principal's behalf and to be subject to the principal's control." *Id.* "An independent contractor is one who contracts with another to do something for him but is neither controlled by the other nor subject to the other's control with respect to his physical conduct in the performance of the undertaking." *Id.* "Even in the absence of a principal-agent or partnership relationship, a party not actually making the fraudulent representation is liable if he accepted the benefits of the transaction and had either actual or constructive knowledge at the time of the fraud, or at the time he accepted the benefits, that fraud had been committed." *Fallert Tool & Eng'g Co. v. McClain,* 579 S.W.2d 751, 756 (Mo.App. 1979). Bayless testified that he had personally guaranteed B.B.C.'s loan. He, therefore, was substantially benefited by the sale. "There is no particular method by which an agency relationship is established. It is necessary only that the credi-

ble facts, taken as a whole, fairly disclose that a party is acting for or is representing another by the latter's authority." *Wickes Lumber Co. v. Richmond Const.,* 690 S.W.2d 488, 490 (Mo.App.1985). "While an agent cannot create or define the scope of his own authority, the testimony of an agent is competent to establish the fact of agency." *Id.* Bayless testified: "my instruction to [Kissick] or I asked him to do this for me, 'please, tell Joe and Marlin anything that you can about this project and tell 'em all about it.'" This was sufficient evidence with which to present the issue to the jury.

**B. Opinion**

 Next, we address whether the statement by Kissick (imputed to defendant) is one of mere opinion. The general rule is that expressions of opinion cannot constitute fraud, and whether a representation is an expression of opinion or statement of fact depends on the circumstances of the case. *Reis,* 997 S.W.2d at 65. "The generally recognized distinction between statements of fact and opinion is that whatever is susceptible of exact knowledge is a matter of fact, while that not susceptible is generally regarded as an expression of opinion." *Id.* Moreover, the general rule is inapplicable if, in addition to expressing an opinion, material facts have been fraudulently concealed. *Id.* Here, the facts present both.

 The court in *Clark v. Olson,* 726 S.W.2d 718, 720 (Mo.1987) held that if the statement is an expression of opinion and not a statement of fact, then the petition failed to allege material representation. "Puffing of wares, sales propaganda, and other expressions of opinion are common, are permitted and should be expected." *Id.* In providing examples, the court noted that a statement that a truck was "in first class mechanical condition" and that the tires had "good rubber" was not mere opinion but referred specifically to the physical condition of a particular truck. *Id.* A statement that the house was "in

588

good condition" referred to a particular house, and "[d]efendants' alleged representation that this house was in good condition conveys sufficient definite information as to the physical character of the house for that representation to be considered material." *Id.* In contrast, the statement in *Guess v. Lorenz*, 612 S.W.2d 831 (Mo. App.1981), that a car was "in good shape," is distinguishable because there was evidence at trial that the defendant had pointed out certain defects in the car before selling it, and there was no evidence the defendant concealed any other known defects. "The forthrightness of the defendant in *Guess* in pointing out the known defects, coupled with the impression she gave of having no knowledge of the intricacies of automotive mechanics, indicates that her representation that the car was in good shape was simply an off the cuff remark meant as a general expression of opinion, not as a statement of fact intended to put plaintiff off his guard." *Clark*, 726 S.W.2d at 720.

 In *Whittlesey v. Spence*, 439 S.W.2d 195, 198 (Mo.App.1969), the statement "[i]t looks alright to me" was held to be an expression of opinion and not a representation of fact as is required to support an action for fraudulent misrepresentations. "Mere expression of opinion that one's title is good will not amount to fraud, even though the title should turn out to be worthless and such expressions, as distinguished from a representation of an existing fact, are not actionable as fraud." *Id.* at 197–98. We disagree with the defendant and find that the statement that the property was "buildable" was not opinion, and further, even if it were opinion, the general rule is inapplicable because other material facts were fraudulently concealed.

## C. Intent to Deceive

Defendant next argues that he did not deliberately suppress the truth with intent to deceive which, he argues, is required under Missouri law. He argues that fraud

implies a guilty knowledge on the part of the alleged tortfeasor; it is not to be presumed; and the burden is on the party claiming fraudulent nondisclosure to show the undisclosed information was beyond his reasonable reach and not discoverable in exercise of reasonable diligence. In *Berman v. Regna*, 728 S.W.2d 285, 286 (Mo.App.1987), the court held there was no affirmative misrepresentation that a residence was suitable for residential use when the salesperson was never asked about prior termite infestation though she knew of it, but also knew it had been treated and she did not know of any structural damage. The court held therefore, that the plaintiffs did not show any intent to deceive. *Id.*

 Plaintiffs respond that defendant's argument is a reiteration of the earlier argument raised regarding the duty to disclose a past condition he claimed had been repaired. Plaintiffs maintain that this ignores Missouri law. Fraud may be established by circumstantial evidence; an actual "representation" may be inferred from the circumstances surrounding the transaction; a claim may arise from the intentional creation of a false impression; questions of intent often present witness credibility issues, that lie within the peculiar province of the jury. *Paglin v. Saztec Int'l, Inc.*, 834 F.Supp. 1184 (W.D.Mo.1993). Plaintiffs also assert that "fraud can scarcely ever be proved by direct evidence." *Chesus v. Watts*, 967 S.W.2d 97 (Mo.App.1998). The "smoking gun" evidence was neither available nor likely to be produced at trial. But there is irrefutable evidence that Bayless had specific information at his disposal, as well as written documentation of the problems. Couple those with the defendant's personal financial liability, and inferences of motive and intent become stronger. Add to that the failed O'Connor transaction just prior to this transaction, and the conclusion could be drawn by a jury that defendant knew of all the problems and knew the earlier transaction failed because of the

soil problems. This evidence, although circumstantial, is sufficient to support an inference of fraud rising above mere suspicion and, therefore, should have been an issue for the jury.

## V. ACCEPTANCE DOCTRINE

Defendant asserts that the "acceptance doctrine," which relieves contractors of liability to third parties who are not a party to the contract once the owner has accepted the contractor's work, is applicable in this case. *Rogers v. Frank C. Mitchell Co.*, 908 S.W.2d 387, 388 (Mo.App.1995). Defendant argues that since B.B.C. hired Tomahawk to build the streets and repair the failures, and the streets were then dedicated to and accepted by the City, with full knowledge and records of the prior slide, then the proper claim is against the City and not against Bayless. He argues also, that the plaintiffs were not buying the streets; the City would have been responsible for future street maintenance and the plaintiffs could have inquired of the City about street issues. Plaintiffs argue there is no indication the trial court gave much consideration to this issue. Secondly, plaintiffs point out that defendant cites no case law applying the doctrine to one who commits a fraud, or even one analogous to this case. Our review of the case law likewise fails to reveal any such extension of authority to the case at bar.

Even were the doctrine potentially applicable to these facts, we find that two exceptions would preclude its application here. Our Supreme Court in *Gast v. Shell Oil Co.*, 819 S.W.2d 367, 371 (Mo. banc 1991), held that after the owner accepts a structure, the general contractor is generally not liable to persons with whom he did not contract, but set forth exceptions to the acceptance doctrine, imposing liability on the contractor after acceptance by the owner if: (1) the defect is imminently dangerous to others; (2) the defect is so hidden that a reasonably careful inspection would not reveal it; and (3) the contractor knows of the defect, but the owner does not.

Furthermore, the theory is generally used by a contractor as a defense, not by the owner. Even if we were to apply it, the third exception put forth by *Gast* leaves defendant open to liability because even if we were to assume the contractor did not know of the defect, which presumably it could have or should have, then the one who accepted the contractor's work (defendant) clearly did know. Moreover, the doctrine does not apply because of exception (2), which applies if the defect is so hidden that a reasonably careful inspection would not reveal it. Clearly, it was not revealed by inspection by the plaintiffs and, for that matter, by the defendant if he is to be believed that he thought the problem resolved.

## VI. CORPORATE LIABILITY

Defendant argues finally that while a corporation acts through its officers, its alleged duty to affirmatively act does not equate to an individual duty on the part of the officer. Absent a piercing of the corporate veil, there is no law supporting a "reverse" of respondeat superior. Although denying that any duty to disclose existed, defendant argues that even if a duty be found, then it was the corporation's obligation and not his, as a corporate officer. In *Osterberger*, the court held that to hold a corporate officer liable, he must have had actual constructive knowledge of the actionable wrong and participated therein. *Osterberger*, 599 S.W.2d at 229. Defendant asserts that there was no evidence he thought or had reason to think the repaired past event was a material issue; there was no factual basis to infer actual or constructive knowledge of fraud or that he participated; and there were no acts of misrepresentation by defendant and the only evidence was that he did not know there was an interest in the past historical events and thus no knowledge of a material nondisclosure. Defendant argues that plaintiffs made no attempt to

pierce the corporate veil and there was no evidence to support a theory B.B.C. as the alter ego of Bayless.

 Plaintiffs respond that B.B.C. was initially a named defendant but dissolved in 1993, after the subject sale and that piercing the corporate veil is only one way to establish the personal liability of a corporate officer. Tortious conduct is another. In Missouri, merely holding a corporate office does not subject one to personal liability for the misdeeds of the corporation. *Grothe v. Helterbrand,* 946 S.W.2d 301, 304 (Mo.App.1997). However, corporate officers may be held individually liable for tortious corporate conduct if they have actual or constructive knowledge of, and participated in, an actionable wrong. *Osterberger,* 599 S.W.2d at 229. It is an issue for the jury whether defendant was present at the time of the Kissick tour and statement and aware of the fraud. In *Osterberger,* the court applied the rule that a corporate officer can be personally liable for the tort of fraudulent concealment to a real estate transaction. *Osterberger, supra.* The corporate officer in *Osterberger* argued that he was acting in his corporate capacity. The court found, however, that he had actual knowledge of the fraudulent event and therefore, found that allowing him to be sued in his individual capacity was not erroneous.

Plaintiffs presented sufficient evidence to avoid a directed verdict at the close of their evidence. The judgement is reversed and the cause remanded for a new trial.

HAROLD L. LOWENSTEIN, Presiding Judge, and ROBERT G. ULRICH, Judge, concur.